UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------x

BRADLEY SIGAL, YDANIS
RODRIGUEZ and DAVID SUKER,

                Plaintiffs,

      - against -

YOLANDA MOSES,

                Defendant.

98 Civ. 3940 (TPG)

**OPINION**

------------------------------------------------x

       This opinion follows a non-jury trial of a portion of a civil rights action. The trial related to the claim that a college president dealt with a student newspaper and a student government election in a way that violated plaintiffs' First Amendment rights. At the trial, it was ultimately conceded, in view of recent Second Circuit case authority, that there was a violation of plaintiffs' First Amendment rights. However, the defendant college president asserted the defense of qualified immunity, and it was this issue to which the trial was mainly devoted, and it is this issue which is the subject of the present opinion. The court holds against the qualified immunity defense.

       In addition to their basic claim of First Amendment violation, brought under 42 U.S.C. § 1983, plaintiffs also claim that the college

president engaged in retaliation against them for exercising their First Amendment rights. The court holds that plaintiffs have proved their basic First Amendment claim, but have not proved the retaliation claim.

## FACTS

The institution involved is the City College of New York (the "City College"), a branch of the City University of New York ("CUNY"). The City College facility is located in Harlem and, in a regular academic year, has about 15,000 students - both undergraduates and graduate students. Defendant Moses was president of City College during the years 1993-1999.

City College had certain forms of student government, one of which was the Graduate Student Council. In the Spring of 1998, student government elections were held, including an election for the Graduate Student Council. Whoever was elected to that council would take office shortly after the spring commencement, and would serve for one year.

There were a total of 19 seats on the Graduate Student Council - 6 for the Department of Education, 6 for Liberal Arts, 4 for Engineering, and 3 for Architecture. However, it sometimes happened that there were not enough candidates to fill all the available seats, and this was true for the election held in the Spring of 1998. No candidate ran for the Engineering or Architecture seats. However, 7 candidates ran for the Education seats, and 7 for the Liberal Arts seats.

A slate ran for the Graduate Student Council from a group called the "New Millenium." The three plaintiffs in this action were among the candidates running on the New Millennium slate. Plaintiffs Ydanis Rodriguez and David Suker ran for Education seats, while plaintiff Bradley Sigal ran for a Liberal Arts seat. New Millennium candidates accounted for 6 out of the 7 candidates running for Education seats, and 4 out of the 7 candidates running for Liberal Arts seats. Thus, out of the total of 14 candidates running for the Graduate Student Council in the Spring of 1998, the New Millennium provided 10 candidates.

Plaintiff Sigal had recently started a campus newspaper called the CCNY Messenger ("the Messenger"). It had put out four issues, and shortly before the Spring election, there was a fifth issue - a Special Edition dealing with the student government election, particularly with the election to the Graduate Student Council.

An important feature of this case is the fact that students at City College were required to pay student activity fees. These fees were used to fund extracurricular activities, including student newspapers. The Messenger received student activity fees to fund its first four issues, and it was expected that student activity fees would fund the special election edition of the newspaper. This edition was published and circulated on April 27, 1998. Election flyers supporting the New Millennium candidates were distributed with this edition. Plaintiff

Bradley Sigal was the editor of the Messenger during the 1997-1998 academic year. As noted earlier, he was among the New Millennium candidates for the Graduate Student Council.

City College had a set of rules governing the 1998 spring student government elections. Three of these rules are at issue in the present action - Rules 2, 3, and 11.

> 2. Slates can raise their own funds. The use of student activity fees (SAF) is prohibited.
>
> 3. Slates may not spend more than $500 on their campaigns. (Note: A slate is one candidate per executive office running together).
>
> 11. Use of the Student Government Office as campaign sites is prohibited.

The purpose of Rule 2 was to make it clear that campaigning for student government offices was to be financed, to the extent funds were needed, by private contributions, not by student activity fees. Rule 3 imposed a limit on how much private money could be spent. Finally, pursuant to Rule 11, candidates could not use a student government office to conduct the campaign.

The student government election was held on April 28-30, 1998. All six New Millennium candidates running for Education seats were elected to fill the six seats allocated to that department. The only other candidate that ran for an Education seat, who ran as Independent, lost. For Liberal Arts, 3 of the 4 New Millennium candidates won, along with another candidate that ran as an Independent. There was also a

three-way tie for the remaining two Liberal Arts seats, between one New Millennium candidate and two Independent candidates, which meant that there would need to be a run-off election. Thus, the result of the April 1998 election was that out of the 12 seats for the Graduate Student Council which were voted on, the New Millennium would have at least 9, and possibly 10.

City College had a mechanism for dealing with complaints about student government elections. It had a Student Election Review Committee ("SERC"), which, among other responsibilities, reviewed complaints regarding the election process. However, the ultimate authority regarding such complaints resided with the president of City College, who was the defendant Moses.

In connection with the Spring 1998 election, the SERC in fact received certain complaints from students. There were four written complaints. Three of these concerned the election issue of the Messenger. Among the points made was that the election edition of the Messenger was in fact a promotional piece for the New Millennium candidates, which was improper and unfair, particularly since the Messenger was supported by student activity fees. Plaintiff Sigal responded to these complaints in a memorandum to the SERC dated May 12, 1998.

On May 15, 1998, the SERC issued a memorandum to President Moses addressing the student complaints. The SERC

concluded that the complaints about the election were not justified. Specifically, the SERC found that the election issue of the Messenger did not constitute campaign material. This obviously meant that there was no violation of any election rule by having student activity fees pay for that issue. The SERC also found that there was no violation of election rules by having election flyers distributed with the paper. The SERC was of the opinion that there was a conflict of interest created by having Sigal, the editor of the Messenger, as a candidate for the Graduate Student Council. However, the SERC found that this did not violate any established campaign rule or policy, though the SERC recommended that such a rule be adopted in the future. In conclusion, the SERC found no basis to nullify the Graduate Student Council election results, and recommended that the election be certified. Apparently, certification by the president of City College was necessary to have the election stand.

On June 18, 1998, President Moses issued a memorandum, in which she rejected the SERC's recommendation to certify the election. She found that three of the election rules had been violated and stated her reasons for this finding.

> I have found that three of the rules for the 1998 Spring Elections have been violated, as follows:
>
> 1. The use of student activity fees is prohibited (see Rule 2).
>
> 2. Slates may not spend more than $500 on their campaigns (see Rule 3).

>   3. Use of the Student Government Offices as a campaign site is prohibited (see Rule 11).
>
>   These rules were violated by the production and distribution of a four page "Elections 1998 Messenger Special Edition" dated April 27 of the newspaper entitled <u>CUNY MESSENGER</u>, by the Graduate Student Government with graduate student activity fees. The third page contains a border box with the candidates of the "New Millennium Slate" which is centrally placed in a manner which receives immediate eye attention, and makes it the equivalent of a piece of campaign literature. In addition, the editorial and other material in the April 27th newspaper (campaign literature) favors the "New Millennium Slate." The picture of a newspaper or flyer on the front page actually says "Vote for the Millennium." Members of the "New Millennium Slate" distributed the newspapers to potential voters together with their own campaign literature, and with their own campaign flyer inserted into the newspaper. The cost of this campaign edition was approximately fourteen hundred dollars ($1,400) in student activity fees. This newspaper was also produced and stored in student government offices with student government equipment, and then disseminated from student government offices.

President Moses then directed that there be a new election in the early Fall. The 14 students who had been candidates in the April election would be entitled to run in the new election, and additional students would also be given an opportunity to run. President Moses' memorandum further stated that students from the schools of Engineering and Architecture should be encouraged to run in the new election.

On August 27, 1998, Thomas D. Morales, Vice President for Student Affairs, addressed a letter to graduate students announcing that a new election would be held September 15-17. Any graduate student candidates who were on the ballot for the Spring 1998 election would automatically be placed on the ballot for the new election, provided that they still met the requirements. New candidates had until September 4 to submit an application to run.

It appears that all the students who had been candidates in the Spring 1998 election were not available to be candidates in the September election. Witnesses at the trial of this action were unable to be specific about the reasons why particular people did not run, but there was an indication that some of them simply did not enroll in City College in the Fall. Three of the six New Millennium candidates, who had run in the Spring of 1998 for Education seats on the Graduate Student Council, did not run in the Fall election. Similarly, two of the four New Millennium candidates who had run in the Spring from the School of Liberal Arts, did not run in the Fall. The result was that only three New Millennium candidates ran in September for the six seats allocated for the School of Education. There were also two Independent candidates. As for the seats allocated to the School of Liberal Arts, only two New Millennium candidates ran, along with four Independent candidates. In the Fall election, three Engineering students and one Architecture student ran for Graduate Student Council, all of whom ran as

Independents.  Since there were no excess candidates in the Fall, all those who ran were elected.  The New Millennium candidates made up only five members of a 15 member Graduate Student Council following the Fall election.

It is now necessary to return to the election issue of the Messenger and the problems President Moses had with it.

The paper consisted of four pages.  On the front page was a message urging students to vote, and an announcement that this issue of the Messenger would function as a "Voter's Guide."  The problem with the paper, from the standpoint of the complaining students and President Moses, related largely to the third page.  A little over half of this page was taken up with material under the heading "Candidate Statements."  At least three-quarters of the section under this heading was devoted to the New Millennium slate.  There was a box containing the pictures of seven of the candidates running on the New Millennium slate.  The box included a very prominent, large, bold-face legend "New Millennium Slate."  Outside the box with the pictures was printed a lengthy New Millennium platform.  Below the material about the New Millennium slate were the names of four Independent candidates, with pictures of two of them.  The heading "Independent Candidates," which introduced the Independent candidates, was in smaller print, and far less prominent than the legend introducing the New Millennium slate.

There can be no doubt that the New Millennium slate was presented far more forcefully than the Independent candidates.

The election edition of the Messenger also included other material. There was a rather lengthy editorial entitled "Graduate Student Council," which was highly critical of how the Graduate Student Council had been conducted in the past. It is fair to say that the strong implication of the editorial was that changes were needed, and the obvious instrument for such change would be the New Millennium slate. However, this editorial was also highly critical of plaintiffs Rodriguez and Suker, who were running on the New Millennium slate, but were incumbents on the Graduate Student Council. The remainder of the issue featured a list of seven election issues, a glossary of terms, and an article about a debate which had been held.

At trial, plaintiff Sigal testified that the Special Edition of the Messenger cost about $300 to print. Sigal testified that he originally expected to be reimbursed for this from student activity fees, but that after the nullification of the election, he did not pursue the matter. Plaintiff Sigal also testified that the only actual campaign expense of the New Millennium slate that he could recall during that Spring 1998 election was that of printing campaign flyers, which he testified cost less than $100.

In her memorandum nullifying the Spring 1998 election, President Moses found a problem with the material on page three dealing

with the New Millennium slate, because it was "centrally placed in a manner which receives immediate eye attention, and makes it the equivalent of a piece of campaign literature." President Moses found that "the editorial and other material" in the paper also favored the New Millennium slate. She further objected to the picture of a flyer on the front page saying "Vote for the Millennium." However, this flyer was actually advertising an undergraduate slate of candidates that called itself Millennium, and not the New Millennium slate at issue here, which was running for Graduate Student Council. Alongside the Millennium flyer were pictures of two other flyers, which advertised the Excalibur and Students' Voice slates of candidates running for the undergraduate student government.

President Moses has testified in court that in deciding whether to nullify the Spring 1998 election, she considered not only the written complaints from the students, but also the fact that rumors were circulating that the election was unfair. According to her testimony, her overriding concern was to make sure that a fair and untainted election was held. She also testified that before making the decision to nullify the election, she consulted counsel for City College, Diane Irvine, as well as the general counsel for CUNY, Michael Solomon. She was assured by both attorneys that she was within her rights to nullify the election.

Since the issue now before the court is whether defendant Moses is entitled to qualified immunity in connection with a First

Amendment violation, the question arises as to how much consideration President Moses gave to First Amendment issues. Surprisingly, when asked by the court if she discussed the First Amendment with either attorney, she replied in the negative, stating "that was not a part of our conversations." When asked if she herself gave any consideration to the First Amendment implications of the problem, she replied in the negative.

President Moses was shown a memorandum dated January 11, 1995, from the then General Counsel of CUNY, Robert E. Diaz, entitled "Regulation of Speech by an Institution of Higher Education." This memorandum included a section dealing specifically with student newspapers and publications, which stated that "a public university may not impose any content-based prohibition on such publications except to serve a 'compelling state interest.' Similarly, a public university may not take adverse action against a student newspaper (such as withdrawing its funding) or against a particular student because it disagrees with the content of a student newspaper." When shown this 1995 memorandum, President Moses stated that she believed it was among the materials considered when she was evaluating the Spring 1998 election. She testified that she "read this document," but "set it aside because it wasn't relevant." She explained that because she "wasn't focused at all on the content" of the newspaper, she "had no intention of dealing with that issue."

The court believes that the trial record regarding whether, and to what extent, President Moses considered First Amendment issues or was advised about such issues is most unsatisfactory. Although President Moses testified that she did not consider the First Amendment and did not discuss the First Amendment with counsel, the court believes that she is doing herself a disservice by this testimony, which may very well be the result of the fact that the incidents in question occurred over 10 years ago. Neither Diane Irvine nor Michael Solomon were ever deposed to develop more fully President Moses' conversations with counsel, nor were they called as witnesses at the trial.

## DISCUSSION

The First Amendment Claim

The legal setting of the present case is quite unique. Last year, the Second Circuit decided a case almost identical on its facts with the present one. There, the president of the College of Staten Island, which is part of the CUNY system, nullified a student government election, because of her finding that a student newspaper, supported by student activity fees, had advocated the election of certain candidates. The district court had held that this action was a violation of the First Amendment, but granted summary judgment in favor of the college president on the ground of qualified immunity.

The Court of Appeals in a lengthy opinion by Judge Calabresi, joined by Judge Walker, with Chief Judge Jacobs dissenting,

Case 1:98-cv-03940-TPG  Document 86  Filed 11/21/08  Page 14 of 20

14

explained that the First Amendment did not permit the college president to take any action against the student newspaper based on the content of that newspaper, and that it was a violation of the plaintiffs' constitutional rights for the president to take adverse action (nullifying the election), because of the views that the newspaper published. Husain v. Springer, 494 F.3d 108, 121-31 (2d Cir. 2007). The court went on to discuss the other issues relating to qualified immunity – whether the violation of the plaintiffs' rights was clearly established by the state of the law at the time of the conduct, and even if it was, whether the president's action was objectively reasonable. Id. at 131.

The court ruled that the state of the law in the Spring of 1997 was such that it was plainly apparent that the college president's actions violated First Amendment rights. Id. at 131-32. This was true despite the fact that no case had at that time been decided dealing literally with the nullification of a student government election based upon the content of a student newspaper. Id. at 132. The court held that the clear meaning of other decided cases was sufficient to cover what was done by the college president in this case. Id. at 131-32.

The court held, however, that there was an issue for trial as to whether the college president was entitled to the defense of qualified immunity. The precise issue defined by the court was whether it was objectively reasonable for the president to believe that her nullification of the election was the lawful implementation of content-neutral election

rules. Id. at 133. The court held that this issue could not be decided as a matter of summary judgment, as the district court had done, and remanded the case for further proceedings.

In the present case, it must be held (and it was ultimately conceded by the defense) that there was a violation of plaintiffs' First Amendment rights in light of the decision in Husain. In the present case, just as in Husain, a student election was nullified, because the student newspaper was deemed to have unduly advocated the election of certain candidates. According to Husain, the students had a right to so advocate, and this right could not be restricted because of the fact that student activity fees were used to support the newspaper.

In the present case, President Moses' main justification for her action was that there was such strong promotion of the New Millennium slate in the Messenger that it became "the equivalent of a piece of campaign literature." The court does not doubt the sincerity of President Moses in this view. But, in applying the "objectively reasonable" standard, the court is of the opinion that the presentation of the New Millennium slate in the Messenger did not rob the paper of its character as a newspaper. Viewing the Messenger in its entirety, as described earlier in this opinion, it was indeed a newspaper, and was entitled to First Amendment protection as such.

Going to the next step in qualified immunity analysis, this court is surely bound by the holding in Husain to the effect that the law

was plainly apparent at the time of the events in question. Indeed, the defense conceded this point at trial.

It is now necessary to decide whether, despite what has just been said about the state of the law, it was nevertheless objectively reasonable for President Moses to believe that her action was lawful, and therefore not a violation of First Amendment rights.

The court is firmly of the view that President Moses was acting in good faith, and that she was of the honest belief that nullifying the Spring 1998 election was necessary in order to have a valid and fair election process, which would have reasonable support from the student body. She obviously believed that the complaints about the election were serious and had substance, and she was further faced with rumors of unfairness circulating about the campus. Thus, she was acting according to her best judgment about what was needed for the welfare of her institution.

One might reasonably say that this is sufficient to provide her with immunity from being sued for her action. But, according to the law as forcefully articulated in Husain, it is not. The question about qualified immunity here must be directed more closely to the specific constitutional rights involved - that is rights under the First Amendment - and these rights cannot be interfered with unless such interference is justified by a compelling government interest. Husain, 494 F.3d at 125. No one contends that such a thing is involved in the present case.

It is true that the issue posed in <u>Husain</u> is whether the college president was objectively reasonable in believing her nullification was the lawful implementation of content-neutral election rules. <u>Id</u>. at 133. And of course, the elections rules relied on by President Moses in the present case were surely content neutral. However, President Moses only arrived at a finding of a violation of those rules after she had decided that the newspaper had lost its character as a newspaper and had instead become the equivalent of a piece of campaign literature. This consideration surely had First Amendment implications. The court believes that a reasonable consideration of the First Amendment implications was necessary in order for President Moses to be "objectively reasonable." This was not a situation, such as often confronts a police officer in having to make an immediate decision about an arrest, or about a search, when criminal evidence might quickly disappear. President Moses had time and she had the opportunity to consult two attorneys. This makes it necessary to return to the state of the record, referred to earlier, about whether she did or did not consider the First Amendment, and obtain legal advice about it.

Although the defense has the burden of proof on the qualified immunity question, the court is willing to give President Moses the benefit of the doubt, and even more than the benefit of the doubt about whether she properly considered and dealt with the First Amendment issue. But there really is no basis for the court to find that

President Moses gave the consideration to the First Amendment, which was required. More than is in the present record may surely have occurred 10 years ago. But the court must act on the record.

The court is compelled to rule that President Moses has not sustained her burden of proof of showing that her action to nullify the Spring 1998 election was objectively reasonable in light of the legal rules under the First Amendment that were clearly established at that time.

At trial, plaintiffs' counsel stated that plaintiff Sigal seeks compensatory damages of $337, the cost of publishing the Special Edition of the Messenger, for which he was not reimbursed. Nominal damages are sought for the other two plaintiffs. The court awards the $337 in damages to Sigal. When President Moses held that the election edition was "campaign literature," her holding implied that plaintiff Sigal would not be reimbursed for that edition with student activity fees, as he had been for the previous four issues. In addition, the court awards nominal damages to plaintiffs Ydanis Rodriguez and David Suker. Plaintiffs' agreed to drop the punitive damages claim with respect to the First Amendment violation.

The Retaliation Claim

Plaintiffs contend that in addition to being unconstitutional under the First Amendment, President Moses' nullification of the Spring 1998 election was taken in retaliation for plaintiffs' political activism, and plaintiffs' filing of this lawsuit against, among others, President Moses.

They seek both compensatory and punitive damages on the retaliation claim.

At trial, plaintiff Sigal testified that prior to the Spring 1998 election, members of the New Millennium slate had been active in organizing protests against policies of the CUNY administration. At some point, plaintiffs discovered a video camera concealed inside a smoke detector at the entrance of a room at City College. Plaintiffs then commenced this lawsuit on June 3, 1998, and their original claim related solely to the video camera. It was on June 18, 1998 that President Moses nullified the Spring 1998 election. Plaintiffs contend that this act was in retaliation both for their political activism, and the bringing of the lawsuit. It should be noted that plaintiffs' complaint was later amended to include the claims about the election.[1]

The court finds that President Moses' decision to nullify the Spring 1998 election was not an act of retaliation for either the political activism or the filing of the lawsuit. The court believes that President Moses was acting in good faith as described earlier.

## CONCLUSION

The court holds that plaintiffs have a valid claim under the First Amendment and 42 U.S.C. § 1983 based upon the nullification of the election following the publication of the Special Edition of the

---

[1] Plaintiffs' claims related to the video camera were dismissed on summary judgment on November 5, 2007.

Messenger. The court awards $337 in compensatory damages to plaintiff Sigal, and nominal damages to plaintiffs Ydanis Rodriguez and David Suker. The court holds that plaintiffs do not have a valid claim of retaliation and the retaliation claim is dismissed.

The issue about a possible award of attorney's fees has not been resolved, and the court will entertain an application for such an award.

Dated: New York, New York
       November 21, 2008

SO ORDERED

_____
Thomas P. Griesa
U.S.D.J.